## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| **GREEN MILLER, JR.,** | ) | |
| **Plaintiff,** | ) | |
| **v.** | ) | **Civil Action No. 01-1651 (RMC)** |
| **BANK OF AMERICA, N.A., Successor by Merger to NationsBank, N.A.,** | ) | |
| **Defendant.** | ) | |

## MEMORANDUM OPINION

In January 1997, Green Miller, Jr., proceeding *pro se*, sued NationsBank, N.A. (now Bank of America, N.A., Successor by Merger) ("Bank").  Since then, this case has dragged on without resolution due largely to Mr. Miller's health, repeated requests for more time, and his status as a *pro se* litigant.  It is time to rule on the merits of the complaint, which alleges: (1) the Bank breached its contract with Mr. Miller when it refused to disburse certain loan proceeds; (2) the Bank violated the Equal Credit Opportunity Act by discriminating against Mr. Miller based on his race; (3) the Bank violated the Fair Housing Act; and (4) the Bank's liens should be declared unenforceable and void.  The Court finds that these allegations are without merit.  The complaint will be dismissed with prejudice.

## BACKGROUND

Mr. Miller is an African-American real estate developer in the District of Columbia, operating a business known as GM II Associates ("GM II").  In the early 1990s, he obtained a series of loans from the Banks to acquire and develop real property. Defendant's Statement of Undisputed

Material Facts ("Facts") ¶ 3.   Each Deed of Trust Note provided an explicit date of maturity and stated that, upon that date, "the entire principal balance, hereof, all accrued and unpaid interest thereon and all other applicable fees, costs and charges, if any, shall be due and payable in full." *See, e.g.*, Deed of Trust on University Place, Miller Dep. Ex. 7.  These Deeds of Trust also gave the Bank the right to foreclose on the loans and force the sale of the collateral real property if Mr. Miller failed to pay amounts owed under the Notes, pay taxes or assessments relating to the land or premises, or keep improvements insured against loss.

Mr. Miller and GM II encountered serious financial difficulties in 1992 as real estate values in Washington, D.C. declined with the economy.   Soon thereafter, in 1995, the outstanding loans to GM II reached maturity and the Bank informed Mr. Miller that it would no longer extend his loans.  Facts ¶ 15.  The Bank explained that it was withdrawing from that business sector and that Mr. Miller should secure his loans from another lender.  *Id.* ¶ 13.

Mr. Miller made several proposals to the Bank in an effort to extend his then-existing loans.  The Bank considered his proposals but determined, based on his numerous prior payment defaults, that Mr. Miller could not maintain the loans at prevailing interest rates and that he was a bad risk for the Bank.  *Id.* ¶ 44.   The Bank also feared that Mr. Miller's prior failure to pay real estate taxes placed the Bank's collateral in jeopardy.

Mr. Miller ceased communicating with the Bank after it refused to extend the loans.  From September 15, 1995 until at least January 16, 1996, Mr. Miller refused to respond to the Bank's inquiries concerning his loans and the condition of the properties.  *Id.* ¶ 45.  Without information or access to the collateral, the Bank scheduled a foreclosure sale for April 2, 1996.  *Id.* ¶ 47.  On the date of the foreclosure sale, Mr. Miller filed a Chapter 13 petition under the Bankruptcy

Code, which was converted to a Chapter 11 reorganization bankruptcy.  *Id.*  The foreclosure sales were stayed and the Bank filed creditor claims in the bankruptcy.  *See id.* ¶ 50.

On or about January 30, 1997, Mr. Miller initiated this action against the Bank in Bankruptcy Court, alleging:  (1) breach of contract; (2) violation of the Equal Credit Opportunity Act, 15 U.S.C. § 1691 *et seq.* (2001); (3) violation of the Fair Housing Act, 42 U.S.C. § 3601 *et seq.* (1999); and (4) defensive recoupment with respect to the Bank's claim as a creditor in the bankruptcy proceedings.  On August 8, 1997, the Bankruptcy Court dismissed the complaint without prejudice and gave Mr. Miller twenty-two days to file an amended complaint.  On October 10, 1997, Mr. Miller filed an Amended Complaint, which the Bank moved to strike as untimely.   On September 18, 2001, the reference for the adversary proceeding was withdrawn from the Bankruptcy Court and the case was transferred to the District Court.

Pursuant to Mr. Miller's Third Amended Plan of Reorganization ("Plan"), submitted by Mr. Miller and formally approved by the Bankruptcy Court, the Bank's claims were scheduled as Class 3 and Class 4 secured claims (in the name of NationsBank, N.A.).  The Plan acknowledged that the Bank held valid liens on two of Mr. Miller's properties in D.C., namely 2566 University Place, N.W. ("University Property") and 6920 Eighth Street, N.W. ("Eighth Street Property").  Mr. Miller was to make payments on the University Property as if the loan were amortized over thirty (30) years, at 8% interest per annum, with loan maturity and a balloon payment five (5) years from November 10, 1997, the effective date of the plan.  Plan at 5.  These terms lowered Mr. Miller's monthly payments to the Bank and created a five-year window in which to repay the University Property loan or obtain alternative financing.  The Plan required Mr. Miller to keep all real estate taxes current and pay the pre-petition real estate taxes over six years with interest at a rate of 7% per

annum. *Id.* at 6.  Accordingly, the loan on the University Property would mature and be due as of

November 10, 2002.  Mr. Miller and the Bank agreed to similar terms for the Eighth Street Property

except that the balloon payment would be due in ten years. *Id.* at 8.  The Plan specifically recognized

that the Bank would retain its liens on both properties. *Id.* at 5.   Mr. Miller and the Bank then

entered into new loan agreements that memorialized the terms of the Plan.

   Mr. Miller thereafter defaulted under the Deeds of Trust, the Plan, and the agreements

by failing to make monthly installment payments of principal and interest.  On September 3, 2002,

the Bank advised Mr. Miller by letter that the University Property loan would mature on November

10, 2002 and that, because the Bank would not renew it, he would need to make alternative financing

arrangements.  On September 16, 2002, the Bank sent Mr. Miller a second letter, advising him that

he was in default on both loans and providing him 30-days' notice to effect a cure.  Mr. Miller failed

to pay the University Property loan upon its maturity.  On December 10, 2002, the Bank sent Mr.

Miller two letters, demanding payment in full on the University Property loan and all defaults on the

Eighth Street Property, and itemizing the principal, interest and late charges that were due.  Another

set of demand letters was sent to Mr. Miller on April 8, 2003, again giving him formal notice of the

defaults and a 30-day period in which to cure.[1]  At that time, Mr. Miller had not paid the amounts

due on the loans or years' worth of real estate taxes.

   The Bank had initially filed a motion for summary judgment, on May 30, 1997 before

the Bankruptcy Court, which granted the motion in part and denied it in part.  On May 12, 2003, the

Bank filed a renewed Motion for Summary Judgment in this Court.  When, after multiple notices

---

[1]  The Bank also gave statutory notice to the mortgagor and Recorder of Deeds in the
District of Columbia.  *See* D.C. CODE § 342-815.

from the Court, Mr. Miller failed to respond to the Bank's motion, this Court dismissed the Amended Complaint on September 12, 2003, for failure to prosecute. Mr. Miller noticed an appeal to the D.C. Circuit Court of Appeals. On May 4, 2004, the Circuit Court reversed and remanded this Court's Order, requiring a fuller explanation of why the Court treated the Bank's motion for summary judgment as conceded.

The Bank continued its attempts to foreclose on the loans and, after notices to Mr. Miller, set a foreclosure sale for August 17, 2004. The case was returned to this Court from the Court of Appeals, and Mr. Miller filed a motion seeking a Temporary Restraining Order ("TRO") and Permanent Injunction ("PI") enjoining the Bank from foreclosing. After a hearing on this motion on July 21, 2004, the Court denied the motion. Mr. Miller promptly filed an appeal. When the Circuit Court refused to stay the foreclosure action,[2] Mr. Miller suddenly paid his obligations to the Bank in full, thus avoiding foreclosure. The Circuit Court dismissed his appeal on the TRO as moot but remanded the matter to this Court for consideration of whether the Court should vacate its oral ruling under the equitable standard set out in *U.S. Bancorp Mortgage Co. v. Bonner Mall Partnership*, 513 U.S. 18, 24-25, 29 (1994). *See In re Green Miller Jr.*, Civ. No. 04-7117 (D.C. Cir. Jan. 31, 2005).

In the meantime, this Court attempted to bring the underlying matter to the point of decision. A briefing schedule on the Bank's May 2003 motion for summary judgment was set at the hearing on the motion for a TRO. Because he is proceeding *pro se* and has had health problems, Mr. Miller was given more than two months, until October 1, 2004, to file his opposition. The Court directed him to file a written request for an extension of time on or before September 24, 2004 if

---

[2]   *See In re Green Miller, Jr.*, Civ. No. 04-7117, Order (D.C. Cir. Aug. 17, 2004).

health reasons would prevent him from meeting the October deadline.  On November 4, 2004, with

nothing filed, the Court, *sua sponte,* granted Mr. Miller an extension of time until December 3, 2004

and reminded him that his opposition was due.  Instead of an opposition, Mr. Miller filed yet another

Motion for a Continuance and Stay on December 3, 2004, asserting health reasons and the fact that

he had appealed the denial of the TRO as the basis for his failure to file an opposition.  The Court

denied the stay but granted an extension until February 18, 2005, to file the opposition.  Mr. Miller

filed an Opposition to Defendant's Motion for Summary Judgment on that date and the Bank

thereafter filed a Reply.

   *Mirabile dictu*! The case is now primed for decision.

## LEGAL STANDARD

   Under Rule 56 of the Federal Rules of Civil Procedure, summary judgment is

appropriate when the record shows "that there is no genuine issue as to any material fact and that the

moving party is entitled to judgment as a matter of law."  FED. R. CIV. P. 56(c);  *Anderson v. Liberty

Lobby, Inc.*, 477 U.S. 242, 247 (1986).  To determine which facts are material, the Court must

examine the substantive law underlying the claim.  *See Anderson*, 477 U.S. at 248.  A "genuine

issue" is one whose resolution could establish an element of a claim or defense, thereby affecting

the outcome of the action.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986).

   In determining whether there is a genuine issue of material fact, the Court must view

the underlying facts and draw all reasonable inferences in favor of the non-moving party.  *See

Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 587 (1986);  *Washington Post Co. v. U.S.

Dep't of Health and Human Servs.*, 865 F.2d 320, 325 (D.C. Cir. 1989).  Once the moving party

shows that there is a lack of evidence supporting the opponent's case, the burden shifts to the non-

movant to demonstrate, through affidavits or otherwise, the existence of a material issue for trial. *See Kingman Park Civic Ass'n v. Williams,* 348 F.3d 1033, 1041 (D.C. Cir. 2003); *Laningham v. U.S. Navy*, 813 F.2d 1236, 1241 (D.C. Cir. 1987).  Conclusory allegations by the non-movant are insufficient to withstand summary judgment.  *See Greene v. Dalton,* 164 F.3d 671, 675 (D.C. Cir. 1999); *Banks v. Chesapeake and Potomac Tel. Co.*, 802 F.2d 1416, 1430 & n.24 (D.C. Cir. 1986).

### ANALYSIS

The Court will address each of Mr. Miller's allegations in turn.

A.      Count One: Breach of Contract

Remaining at issue in Count One is whether there was a breach of the Bank's implied covenant of good faith and fair dealing when it:

•      Rejected Mr. Miller's proposal to restructure and extend his matured loans.

•      Initiated foreclosure on all loans in April 2003.

•      Added costs in the attempt to foreclose that allegedly exceeded "what was fair and reasonable."

The Court finds that there is no evidence that the Bank breached its implied covenant of good faith and fair dealing through these actions.

First, the Bank had no duty to renew or extend the loan terms after Mr. Miller's loans matured.  *See Fasolino Foods Co., Inc. v. Banca Nazionale Del Lavoro*, 961 F.2d 1052, 1056-57 (2d Cir. 1992).  The Bank gave Mr. Miller two-months' notice that it would not renew the University Property loan, considered Mr. Miller's proposal to restructure and extend both loans, and lawfully determined that Mr. Miller was a bad loan risk.  Although Mr. Miller argued to the Bank and to this Court that racial animus was behind the decision not to restructure and extend his loans, he offers

no proof to support that allegation nor evidence that the Bank's nondiscriminatory reason for its action was a pretext for unlawful discrimination.  Mr. Miller does not dispute that he was in default for (1) failure to make payments on the loans and (2) failure to pay property taxes.  Similarly, the Bank had no obligation to ignore the terms of the documents that governed the loan on the Eighth Street Property, by which failure to make monthly installments was grounds for acceleration of the loan and foreclosure on the underlying collateral real property.  *See Fleet Bank of Maine v. Matthews*, 795 F. Supp. 492, 494 (D. Me. 1992); *see also Lincoln Sav. Bank v. Hays*, 671 F.2d 198, 201 (6th Cir. 1982) (noting it is well-settled that a mortgagee may pay delinquent taxes, add taxes to debt, and foreclose on the total sum).

Second, the clear terms of the loan documents permitted the Bank to foreclose on both properties upon 30-days' notice of default and a right to cure.  "If the Grantor fails to cure such default, the Lender may, immediately thereafter proceed with the enforcement of its rights and remedies under the [Eighth Street or University Property] Loan Documents and applicable law including, without limitation, foreclosing on the Property."  *See* Eighth Street Property Agreement ¶ 8;  University Property Agreement ¶ 4.  On two occasions, the Bank sent formal notice to Mr. Miller concerning each property and extended a thirty-day window to cure.  On no occasion did Mr. Miller attempt a cure.  The Bank also sent formal statutory notice to Mr. Miller.  The Court cannot find that the Bank acted improperly in moving toward foreclosure in April 1996.

Third, Mr. Miller specifically agreed to pay the costs of any foreclosure action and he offers no proof that the costs incurred by the Bank were extraordinary.  In fact, Mr. Miller hardly speaks to these issues.  He states that there are genuine issues of material fact in dispute because he disputes the amount of money Defendant alledges [sic] was disbursed to

and owed by Plaintiff.  On August 18, 2005, Defendant required Plaintiff to pay $393,272.51 under threat of foreclosure.  Defendant has refused to provide evidence of the monies it alledgely [sic] disbursed to plaintiff [sic] – Dates, Amounts and copies of the Checks etc. evidencing those disbursements.  Defendant has created a maze of Deeds, Notes and extension[s] as a means of cover up.

Plaintiff's Statement of Disputed Material Facts ("Pl.'s Facts") at 2.  Mr. Miller also attacks the

Declaration of Matthew J. Benson, submitted by the Bank, because Mr. Benson did not have direct

involvement in the case and is not in a position to authenticate documents.  *Id.* at 1.[3]  These

arguments do not prove that the Bank breached any implied covenant of good faith when it refused

to extend Mr. Miller's loans in 1995, attempted to foreclose in 1996, or added costs to the loans

thereafter.

Pursuant to an October 21, 1997 Consent Order fixing Class 3 and Class 4 claims of

the Bank ("Consent Order"), the Bankruptcy Court created an allowed claim of $156,000 with

respect to the Eighth Street Property and an allowed claim of $130,000 with respect to the University

Property.  *See* Memorandum in Opposition to Motion for Temporary Restraining Order, Ex. B.  Mr.

Miller argued extensively that the Bank wanted more money than he owed in connection with his

motion for a TRO.  The Court's conclusion now is the same as it was when it denied the TRO:  Mr.

Miller may believe that he owed less on the Property in 1996 but the amounts in question were set

by formal order of the Bankruptcy Court, to which Mr. Miller consented, and interest continued to

accrue until Mr. Miller paid in full in August 2005.

Because there is no credible evidence to support Mr. Miller's breach-of-contract

---

[3]  This objection is without merit.  Mr. Benson authenticates the Bank's normal business records as a custodian of records, not as an actor in the drama.  Further, Mr. Miller points to no document that he claims is not authentic.

claim, it will be dismissed.

        B.        <u>Counts Two and Three:  Fair Housing Act and Equal Credit Opportunity Act</u>

        Mr. Miller, an African-American, alleges that the Bank discriminated against him because of his race in its lending decisions in 1995.  He claims violations of the Fair Housing Act, 42 U.S.C. § 3601 *et seq*. ("FHA"), and the Equal Credit Opportunity Act, 15 U.S.C. § 1691 *et seq*. ("ECOA").  The FHA is inapplicable to this case because Mr. Miller used the properties for commercial purposes.  *Home Quest Mortgage v. Am. Family Mut. Ins. Co.*, 340 F. Supp. 2d 1177, 1186 (D. Kan. 2004) ("[T]he FHA broadly encompasses most residential property . . . but it does not extend to commercial property.  Extending the FHA to prevent discrimination against a person who owns residential property as a commercial venture would do nothing to further the stated purpose of the FHA . . . .");  *Shaikh v. City of Chicago*, No. 00-4235, 2001 WL 123784, at *4 (N.D. Ill. Feb. 13, 2001) (FHA does not apply to persons who hold residential property as a commercial venture where that person does not intend to reside on the property and is not suing on behalf of a protected class who would reside there);  *Hargraves v. Capital City Mortgage Corp.*, 140 F. Supp. 2d 7, 22 (D.D.C. 2000) (FHA applies only because the buildings would be used as "dwellings").  However, even if both statutes applied, the Court finds a total lack of evidence to support these claims.

        Mr. Miller alleges two discriminatory acts by the Bank:  (1) the Bank's 1995 rejection of his request that it extend and restructure his matured term loans, while allegedly granting such treatment to similarly-situated white customers, and (2) the Bank's rejection, in the summer of 1995, of his request for new loans to finance the development of his property on the 1300 block of Belmont Street, N.W. ("Belmont Property"), while allegedly financing similar projects for similarly-situated white customers.  Amended Complaint ¶ 19.B & C. To prove that the Bank discriminated against

him in its lending decisions, Mr. Miller must first establish a *prima facie* case of discrimination.

In the absence of direct discrimination, courts generally apply the burden-shifting scheme set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).[4]  Under that framework, the plaintiff must first establish by a preponderance of the evidence a *prima faci*e case of discrimination.  If successful, the burden of production shifts to the defendant to articulate a legitimate, nondiscriminatory reason for its conduct.  If this burden is met, "the presumption of intentional discrimination disappears, but the plaintiff can still prove disparate treatment by, for instance, offering evidence demonstrating that the [defendant's] explanation is pretextual." *Raytheon Co. v. Hernandez*, 540 U.S. 44, 50 n.3 (2003).

It is undisputed that Mr. Miller is an African-American and that the Bank rejected his 1995 proposals for additional financing for the Belmont Property and for loan extensions for the

---

[4]  The *McDonnell Douglas* burden-shifting scheme may reasonably be applied to FHA and ECOA claims.  *See Crawford v. Signet Bank*, 179 F.3d 926, 929 n.5 (D.C. Cir. 1999) (noting that the Seventh Circuit rejected the *McDonnell Douglas* framework in mortgage discrimination suits, but refusing to resolve the issue); *Miller v. Poretsky*, 595 F.2d 780, 791 n.15 (D.C. Cir. 1978) (Robinson, J., concurring) (stating that the reasoning in *McDonnell Douglas* "seems equally applicable to private nonclass actions alleging discrimination in violation of the Fair Housing Act"); *Neithamer v. Brenneman Prop. Servs., Inc.*, 81 F. Supp. 2d 1, 4 (D.D.C. 1999) (noting that, "[a]lthough the D.C. Circuit Court of Appeals has not yet addressed the issue, a number of other Circuit Courts have already ruled that when a plaintiff offers no direct evidence of discrimination, his claim of discrimination under the FHA is to be examined under the burden-shifting framework of [*McDonnell Douglas*]"); *see also Rosa v. Park W. Bank & Trust Co.*, 214 F.3d 213, 215 (1st Cir. 2000) ("In interpreting the ECOA, this court looks to Title VII case law . . . ."); *Matthiesen v. Banc One Mortgage Corp.*, 173 F.3d 1242, 1246 (10th Cir. 1999) (affirming decision to analyze ECOA "claim in the same manner as discrimination claims brought under Title VII"); *Lewis v. ACB Bus. Servs., Inc.*, 135 F.3d 389, 406 (6th Cir.1998) (applying Title VII's framework to ECOA claim); *Haynie v. Veneman*, 272 F. Supp. 2d 10, 16 (D.D.C. 2003) (analogizing ECOA to Title VII); *Cooley v. Sterling Bank*, 280 F. Supp. 2d 1331, 1337-38 (M.D. Ala. 2003) (concluding that the Title VII analytical approach applies to ECOA discrimination claims).  *But see Latimore v. Citibank Fed. Sav. Bank*, 151 F.3d 712, 713-15 (7th Cir. 1998) (rejecting burden-shifting model).

University and Eighth Street properties.  What is lacking is any evidence that the Bank restructured or extended loans to any white customer with a similar credit history.

Mr. Miller does not contest any of the facts that the Bank provides concerning his loan history.  By the middle of 1993, Mr. Miller and GM II had $200,000 in outstanding Bank loans. After the Bank rejected his demand for an additional $10,000 in operating capital, an extension of his loans until 1998, and financing for the Belmont Property, Mr. Miller accused the Bank of race discrimination.  Facts ¶ 24.   The Bank compromised on his demands and advanced the additional $10,000 but did not extend the maturity dates on the loans or finance the development of the Belmont Property.  Facts ¶¶ 26, 27.

Mr. Miller wrote to the Bank on November 7, 1994, requesting an extension of the loans until 1998, the disbursement of additional funds, and the Bank's participation in developing the Belmont Property.  Facts ¶ 31.  Discussions between Mr. Miller and the Bank were unsuccessful. As most of the loans matured, Mr. Miller tendered a payment for some of the accrued interest but was unable and did not pay any part of the principal amounts that were due and owing.  He sent a letter to the Bank, explaining that he could not make the loan payments because of cash flow problems.

Mr. Miller's financial problems were not limited to his relationship with the Bank. Indeed, the Department of Housing and Urban Development ("HUD"), the senior lienholder on the University Property, initiated foreclosure proceedings due to Mr. Miller's payment defaults.  Facts ¶ 36.  Mr. Miller managed to avoid that foreclosure.  Riggs National Bank, however, foreclosed on two of Mr. Miller's other rental properties in 1994.  Facts ¶ 44.

By September 1995, Mr. Miller had insufficient operating capital to meet his personal

and family obligations and had no other source of income. *See* Facts ¶¶ 38-44.  His discussions with

the Bank on interim financing for the University Property and the Eighth Street Property were

unsuccessful because he could not afford a payment plan at the prime rate or higher. *Id.*  Because

of this unrebutted credit history and troubled financial background, Mr. Miller has failed to

demonstrate that he or GM II qualified for additional loans or loan extensions from the Bank in 1995.

Therefore, he has failed to make out a *prima facie* case of discrimination.

Additionally, Mr. Miller has presented no evidence that the Bank treated similarly-

situated white patrons – with multiple loan defaults, foreclosures, taxes in arrears, and no operating

capital – differently.   As part of this case, Mr. Miller testified in a 1996 deposition that, in early

1992, "I was aware that the Bank was making similar loans to – to similar-situated [sic] customers."

Defendant's Motion for Summary Judgment, Ex. 25 (Miller Deposition) at 64.  In all the years since

then, he has been unable to substantiate this statement.  The Court finally ordered discovery closed

and ruled that Mr. Miller's failure to respond to the Bank's discovery requests limited him to relying

on information or evidence that he had disclosed to the Bank before April 2, 2003.  Despite the age

of this case and the multiple filings, the Court finds no evidence to support Mr. Miller's accusation

of racial discrimination in the Bank's lending practices.  Summary judgment will be granted to the

Bank on Counts Two and Three.

C.    Count Four:  Enforceability of the Liens

The Amended Complaint asserts that the Bank's liens on the University Property and

the Eighth Street Property are unenforceable and asks that they be declared void.  On August 18,

2004, Mr. Miller paid the Bank in full and the foreclosure sales were cancelled.  The Bank has sent

copies of the Deed of Trust Notes stamped "PAID," as well as copies of the Deed Releases and

-13-

Terminations of all recorded documents under the Uniform Commercial Code. Accordingly, these claims are moot. *See Powell v. McCormack*, 395 U.S. 486, 496 (1969) (doctrine of mootness requires courts to dismiss cases where the issues presented are no longer live or the parties lack a legally cognizable interest in the outcome).

D.     Status of Court's Oral Opinion on TRO

The question in *U.S. Bancorp Mortgage Co.* was "whether appellate courts in the federal system should vacate civil judgments of subordinate courts in cases that are settled after appeal is filed or certiorari sought." 513 U.S. at 19. In answering this question, the Supreme Court set out specific guidelines for vacatur if a case on appeal becomes moot. The basic principle at issue is that "[a] party who seeks review of the merits of an adverse ruling, but is frustrated by the vagaries of circumstance, ought not in fairness be forced to acquiesce in the judgment." *Id.* at 25. "The principal condition to which we have looked is whether the party seeking relief from the judgment below caused the mootness by voluntary action." *Id.* at 24; *see also id.* at 24-25 (citing *United States v. Hamburg-Amerikanisch Packetfahrt-Actien Gesellschaft*, 239 U.S. 466, 478 (1916) and *Heitmuller v. Stokes*, 256 U.S. 359, 362 (1921)).

In this case, Mr. Miller sought a TRO to prevent foreclosure on his two properties as planned by the Bank in August 2004. This Court denied the TRO and entered an oral ruling against Mr. Miller. The Court of Appeals denied a stay and Mr. Miller paid the entirety of the outstanding loans, plus interest and costs. The foreclosure was avoided and his appeal from this Court's denial of a TRO became moot. Inasmuch as the mootness arose from Mr. Miller's own actions, he "voluntarily forfeited his legal remedy by the ordinary processes of appeal or certiorari, thereby surrendering his claim to the equitable remedy of vacatur." *U.S. Bancorp Mortgage Co.*, 513 U.S.

-14-

at 25.

Having considered whether to vacate its oral ruling, the Court concludes that such an equitable remedy is not available to Mr. Miller and declines to do so.

## CONCLUSION

GM II was a small, minority-owned real estate development business that appears to have collapsed financially in the wake of the 1992 recession. Since 1996, the Bank has been attempting to foreclose on two properties for which loans were outstanding and due. Through bankruptcy and this litigation, Mr. Miller managed to forestall the foreclosures until August 2005, at which time he paid the loans in full. This case, with roots back to 1992, is an empty sideshow to the threats of foreclosure at center stage. Having finally brought it to the point of decision, the Court finds that there is an absence of proof to support the complaint's allegations. Summary judgment is granted to the Bank and the Amended Complaint is dismissed with prejudice. A separate order accompanies this memorandum opinion.

DATE: July 13, 2005.                                /s/_____
                                                    ROSEMARY M. COLLYER
                                                    United States District Judge